## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

PRN FUNDING, LLC           )
                                )
         Plaintiff,        )     JUDGE
                                )
*v.*                                 )
                                )
WAUKEGAN ILLINOIS HOSPITAL   )     NOTICE OF REMOVAL TO FEDERAL
COMPANY, LLC                 )                 COURT
dba Vista Medical Center East      )
                                )
         Defendant.       )
                                )

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §1441 and 28 U.S.C. §1446, Defendant Waukegan Illinois Hospital Company, LLC hereby removes the above-captioned action to this Court from the Cuyahoga County Court of Common Pleas.

1. Waukegan Illinois Hospital Company, LLC is the Defendant in the civil action brought on May 5, 2024 in the Cuyahoga County Court of Common Pleas.

2. This case is removable under 28 U.S.C. §1441(a) because this is an action of a civil nature in which the District Courts of the United States have been given original jurisdiction under 28 U.S.C. §1332(a)(1). The amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity between Plaintiff and Defendant in this action. Plaintiff is a company headquartered and incorporated in

Cleveland, OH and Defendant is a company headquartered and incorporated in Chicago, IL. Removal of this case on the basis of diversity of citizenship is not precluded by the 28 U.S.C. §1441(b)(2) because none of the parties in interest properly joined and served as Defendant in this action is a citizen of the State of Ohio, in which this action was brought.

3.  Plaintiff's complaint was served on May 2, 2024. Defendant filed a motion for 30 days leave to answer or otherwise plead on May 16, 2024. The motion was granted. This notice of removal is filed within 30 days of receipt of the order and is therefore timely under 28 U.S.C. §1446(b).

4.  Pursuant to 28 U.S.C. §1446(a), Defendant attaches to this notice the following papers, which are all of the process, pleadings, and orders served on it prior to removal of this action:

    a.  Complaint, attached hereto as Exhibit A.

    b.  Motion for 30 Days Leave to Answer or Otherwise Plead, attached hereto as Exhibit B.

    c.  Demand letter from Plaintiff showing that claims in this case exceed the $75,000 threshold as Exhibit C.

Respectfully submitted,

Mark M. Turner (0075516)
Law Offices of Mark M. Turner, LLC
3091 Mayfield Rd.
Suite 320
Cleveland Heights, OH 44118
mmturneresq@gmail.com
Ph: 216-331-0007
Attorney for Defendant

Exhibit A



### NAILAH K. BYRD
### CUYAHOGA COUNTY CLERK OF COURTS
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed: COMPLAINT**
**April 23, 2024 13:58**

By: T. CHRISTOPHER O'CONNELL 0075395

Confirmation Nbr. 3147968

PRN FUNDING, LLC                                    CV 24 996335

     vs.

WAUKEGAN ILLINOIS HOSPITAL COMPANY, LLC      **Judge:**  JEFFREY P. SAFFOLD

**Pages Filed:** 13

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| PRN FUNDING, LLC<br>25101 Chagrin Blvd., Suite 250<br>Cleveland, OH 44122 | ) )<br>) )<br>) | Case No:<br><br>JUDGE |
|      Plaintiff, | )<br>) | |
| v. | )<br>) | |
| WAUKEGAN ILLINOIS HOSPITAL<br>COMPANY, LLC<br>dba Vista Medical Center East<br>c/o CT Corporation System, as statutory<br>agent<br>208 So. Lasalle Street, Suite 814<br>Chicago, IL 60604-1101 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
|      Defendant. | )<br>) | |

---

## COMPLAINT

---

For its Complaint against Defendant, Plaintiff PRN Funding LLC ("PRN") states as follows:

### FACTUAL ALLEGATIONS

1.  PRN is a factoring company located in Cleveland, Ohio. Factoring companies purchase accounts receivable from a business at a discount so that the business can generate cash flow.

2.  Non-party Phoenix Medical Group, LLC ("PMG") is a medical staffing company that provides healthcare staffing services to nursing homes, hospitals and assisted living facilities.

3.      Defendant Waukegan Illinois Hospital Company, LLC dba Vista Medical Center East ("Vista") is a hospital that utilized the services of PMG.

4.      PRN entered into a Factoring and Security Agreement with PMG on November 29, 2017, to purchase and collect upon PMG's receivables (the "Factoring Agreement"). A copy of the Factoring Agreement is attached as Exhibit 1. The parties agreed, in Section 28 of the Factoring Agreement, that the Common Pleas Court of Cuyahoga County is an appropriate venue and jurisdiction for all disputes.

5.      After execution of the Factoring Agreement, PMG began to sell and assign certain accounts receivable to PRN.

6.      One of those accounts receivable owed to PMG was owed by Defendant Vista.

7.      Defendant Vista was notified of the Factoring Agreement and the assignment of the receivables in a letter, sent on April 11, 2023, (the "Notice of Assignment").  A true and accurate copy of the Notice of Assignment sent to Defendant is attached hereto and incorporated herein as Exhibit 2.

8.      Pursuant to the Notice of Assignment and Factoring Agreement, Defendant Vista was required to send all payments, whether previously owed or accruing to PMG, to PRN.

9.      To the extent that Defendant Vista was indebted to PMG as of April 11, 2023, (i.e., after the Notice of Assignment), Defendant Vista became indebted to PRN.

10.     Payment in any way other than to PRN would not discharge Defendant Vista's obligations.

11.     By incurring additional indebtedness to PMG after April 11, 2023, Defendant Vista accepted the terms of the Notice of Assignment and Factoring Agreement.

12.     Defendant Vista placed orders from PMG after receiving the Notice of Assignment on April 11, 2023.

13.     Thereafter, Defendant Vista began making payments to PRN but for reasons unknown, ceased making payments.

<u>Count One</u>
(Breach of Contract)

14.     PRN restates the foregoing as if fully set forth herein.

15.     Pursuant to the Factoring Agreement, PMG, sold and assigned to PRN its accounts receivable, including those owed by Defendant Vista.

16.     PRN paid PMG for those accounts receivable and as a result, stepped into the shoes of PMG.

17.     Defendant Vista was notified of the Factoring Agreement and assignment pursuant to the Notice of Assignment.

18.     Defendant Vista was notified that any debt owed and accruing after it received the Notice of Assignment, was to be paid to PRN.

19.     Defendant Vista was notified that payment to anyone other than PRN, would not discharge the obligation.

20.     Defendant Vista accrued further debt with PMG after the Notice of Assignment.

21.     Defendant Vista failed to send all payments owed to PRN.

22.     Defendant Vista breached its agreement with PRN.

23.     As a result of Defendant Vista's breaches, PRN has been damaged in an amount to be determined at trial.

Count Two
(R.C. § 1309.406)

24.     PRN restates the foregoing as if fully set forth herein.

25.     Defendant Vista is an "account debtor" in accordance with Chapter 1309.406 of the Ohio Revised Code.

26.     PRN notified Defendant Vista of PMG's assignment of its accounts receivable pursuant to the Notices of Assignment. Accordingly, Defendant Vista was required to forward to PRN, in Cuyahoga County, all future payments.

27.     Despite having notice of the above assignments, Defendant Vista wrongfully and knowingly stopped and/or refused to make payments to PRN.

28.     Because of the improper payments made by Defendant Vista, PRN has been damaged.

29.     The payments made by Defendant Vista over the above referenced Notice of Assignment constitutes a violation of R.C. § 1309.406/U.C.C. 9-406.

30.     Pursuant to R.C. § 1309.406/U.C.C. 9-406, Defendant Vista cannot discharge its debts by paying PMG directly and it remains liable to PRN for the full amount assigned to PRN.

WHEREFORE, PRN prays for judgment against Defendant as follows:

(a)     On Counts One and Two, against Defendant Vista for compensatory damages in an amount to be determined at trial in excess of $25,000.00, plus appropriate interest and prejudgment interest thereon, late payment fees, costs, and expenses, including attorneys' fees pursuant to R.C. 1309.607(D); and

(b)    Such other relief as this Court deems just and equitable.

Respectfully submitted,

/s/Christopher O'Connell
Christopher O'Connell
(Reg. No. 0075395)
Singerman, Mills, Desberg & Kauntz Co., L.P.A.
3333 Richmond Road, Suite 370
Beachwood, Ohio 44122
coconnell@smdklaw.com
(216) 292-5807
Attorneys for Plaintiff PRN Funding LLC



## PRN FUNDING, LLC

25101 CHAGRIN BLVD     216.504.1000
SUITE 250     866.776.5407
CLEVELAND, OHIO 44122     216.504.1002 fax

### FACTORING AND SECURITY AGREEMENT

THIS FACTORING AND SECURITY AGREEMENT is made as of __10/6/17__ by and Phoenix Medical Group, LLC dba Phoenix Medical Staffing ("Seller") and PRN FUNDING, LLC ("Purchaser").

1. **Definitions.** All capitalized terms not defined herein shall have the meaning set forth in the UCC in effect in the Chosen State. The following terms used herein shall have the following meanings:

1.1. "Administrative Fee" means zero percent (0%) of the Face Amount of Purchased Accounts.

1.2 Avoidance Claim" means any claim that any payment received by Purchaser from or for the account of an Account Debtor is avoidable under the Bankruptcy Code or any other debtor relief statute.

1.3. "Bankruptcy Case" means any case or controversy filed pursuant to the Bankruptcy Code.

1.4. "Bankruptcy Code" means the United States Bankruptcy Code, as amended, and all regulation promulgated thereunder.

1.5. "Chosen State" means Ohio.

1.6. "Clearance Days" means two (2) business days.

1.7. "Closed" means, with respect to a Purchased Account, the first to occur of (a) receipt of *full and complete* payment by Purchaser, which shall not be deemed to occur until the relevant number of Clearance Days has passed or (b) the unpaid Face Amount has been charged to the Reserve Account by Purchaser pursuant to the terms hereof.

1.8. "Closing Date" means the date on which a Purchased Account is Closed.

1.9. "Collateral" means all now owned or hereafter acquired personal property and fixtures, and proceeds thereof, including, without limitation, Accounts, Chattel Paper, Goods, Inventory, Equipment, Instruments (including Promissory Notes), Investment Property, Documents, Letter of Credit Rights, Deposit Accounts, General Intangibles and all Proceeds of the foregoing.

1.10. "Eligible Account" means any Account that is acceptable for purchase as determined by Purchaser in the exercise of its reasonable sole credit or business judgment.

1.11. "Event of Default" means any event described in Section 12.1.

1.12. "Face Amount" means the face amount due on any Account at the time of Purchase.

1.13. "Factoring Fee" means the Factoring Fee Percent multiplied by the Face Amount of a Purchased Account for each Factoring Fee Period that any portion remains unpaid computed from the Purchase Date through the Closing Date.

1.14. "Factoring Fee Percent" means one percent (1%).

1.15. "Factoring Fee Period" means each ten (10) day period or portion thereof commencing on the Purchase Date and ending on the Closing Date.

1.16. "Insolvency Event" means the filing of a petition under any state or federal debtor relief or liquidation statute by or against an Account Debtor at any time after the Purchase Date.

1.17. "Invoice" means the document that evidences or is intended to evidence any Account and where the context so requires, reference to an Invoice shall be deemed to refer to the Account to which it relates.

1.18. "Invoice Date" means the date on which Seller invoices its customers in respect of any Account purchased hereunder.

1.19. "Maximum Amount" means $500,000.

1.20. "Misdirected Payment Fee" means a fee equal to fifteen percent (15%) of the amount of any payment on a Purchased Account that has been received by Seller and not delivered in kind to Purchaser on the next business day following the date of receipt by Seller, or thirty percent (30%) of the amount of any such payment, which has been received by Seller as a result of any action taken by Seller to cause such payment to be misdirected away from Purchaser.

1.21. "Obligations" means all present and future obligations owing by Seller to Purchaser whether or not for the payment of money, whether or not evidenced by any note or other instrument, whether direct or indirect, absolute or contingent, due or to become due, joint or several, primary or secondary, liquidated or unliquidated, secured or unsecured, original or renewed or extended, whether arising before, during or after the commencement of any Bankruptcy Case in which Seller is a Debtor, including, without limitation, any obligations arising pursuant to letters of credit or acceptance transactions or any other financial accommodations.

1.22. "Origination Fee" means a fee equal to $0.

1.23. "Outside Date" means 90 days after the Invoice Date.

Electronically Filed 04/23/2024 13:58 / I / CV 24 996335 / Confirmation Nbr. 3147968 / CLAJB

**EXHIBIT**

1

1.24. "Parties" means Seller and Purchaser.

1.25. "Purchased Accounts" means any Accounts purchased hereunder that are not Repurchased Accounts.

1.26. "Purchase Date" means the date on which Purchaser pays the Purchase Price pursuant to Section 2.1.4 of this Agreement.

1.27. "Purchase Price" means the Face Amount.

1.28. "Repurchased Account" means any Account that has been repurchased when Seller has paid to Purchaser the then unpaid Face Amount.

1.29. "Required Reserve Amount" means twenty percent (20%) multiplied by the unpaid balance of Purchased Accounts.

1.30. "Reserve Account" means a bookkeeping account on the books of the Purchaser representing an unpaid portion of the Purchase Price that is maintained by Purchaser to ensure Seller's performance with the provisions hereof.

1.31. "Reserve Shortfall" means the amount by which the Reserve Account is less than the Required Reserve Amount.

1.32. "Schedule of Accounts" means a form supplied by Purchaser from time to time wherein Seller lists such of its Accounts as it requests that Purchaser purchase under the terms of this Agreement.

1.33. "Seller's Account" means any demand deposit account maintained by Seller, or represented by an employee of Seller to be maintained by Seller.

1.34. "UCC" means the Uniform Commercial Code as in effect in the Chosen State, as may be amended from time to time.

2. **Sale; Purchase Price; Billing; Reserve.**

2.1. Assignment and Sale.

2.1.1.Seller shall sell to Purchaser as absolute owner, such of Seller's Accounts as are listed from time to time on Schedules of Accounts. Upon purchase, Purchaser will assume the risk of non-payment on Purchased Accounts solely due to the occurrence of an Insolvency Event, except that in respect of any Purchased Account which has not been Closed by the Outside Date, Seller shall assume the risk of non-payment due to the occurrence of an Insolvency Event after the Outside Date.

2.1.2.Each Schedule of Accounts shall be accompanied by such documentation supporting and evidencing the Account that Purchaser shall from time to time request.

2.1.3.Purchaser shall purchase from Seller such Accounts as Purchaser determines to be Eligible Accounts, so long as the unpaid balance of Purchased Accounts does not exceed, before and after such purchase, the Maximum Amount.

2.1.4.Purchaser shall pay the Purchase Price, less any amounts due to Purchaser from Seller, including, without

limitation, any amounts due under Section 2.3 hereof, of any Purchased Account, to Seller's Account after Purchaser receives all of the requisite documentation from Seller and verifies the information therein, to its sole satisfaction.

2.2. Billing.  Purchaser may send a monthly statement to all Account Debtors itemizing their account activity during the preceding billing period. All Account Debtors will be instructed to make payments to Purchaser.

2.3. Reserve Account.  Purchaser may apply a portion of any Purchase Price to any Reserve Shortfall. Seller shall pay to Purchaser on demand the amount of any Reserve Shortfall. Purchaser shall pay to Seller on the 15th (fifteenth) and last day of each month any amount by which collected funds in the Reserve Account are greater than the Required Reserve Amount. Purchaser may charge against the Reserve Account the fair market value of any Obligation, including, without limitation, any amounts due from Seller to Purchaser hereunder. Purchaser may pay any amounts due Seller hereunder by a credit to the Reserve Account.  Upon termination of this Agreement, Purchaser may retain the Reserve Account for ninety (90) days thereafter to be applied to payment of any Obligations that were unknown to Purchaser at the time of termination.

3. **Authorization for Purchases.**  Subject to the terms and conditions of this Agreement, Purchaser is authorized to purchase Accounts upon telephonic, electronic mail (i.e., e-mail) facsimile or other instructions received from anyone purporting to be an officer, employee or representative of Seller.

4. **Fees and Expenses.**  Seller shall pay to Purchaser the fees and expense provided for in this Section 4 and elsewhere in this Agreement.

4.1. Fees.  Seller shall pay Purchaser (a) the Factoring Fee on the Closing Date, (b) the Administrative Fee on the Closing Date, (c) the Origination Fee at the time of the first funding under this Agreement and (d) any Misdirected Payment Fee immediately upon it being accrued.

4.2. Out-of-Pocket Expenses.  Seller shall pay Purchaser the out-of-pocket expenses directly incurred by Purchaser in the administration of this Agreement such as wire transfer fees, postage and audit fees.  Seller shall not be required to pay for more than four (4) audits per twelve (12) month period.

4.3. Savings Clause.  Notwithstanding that the Parties agree that the transactions contemplated by this Agreement are sales of Accounts and not loans, if any court or forum recharacterizes the transactions contemplated under this Agreement as loan transactions and any fees and expenses provided for hereunder are recharacterized as interest, then at no time will Seller be obligated or required to pay the amount of any such recharacterized fees or expenses that if paid could subject Purchaser to either civil or criminal liability as a result of the recharacterized fees and expenses causing Seller to contract or agree to pay an interest rate that is greater than maximum rate permitted by law. In all events, however, Seller shall pay and Purchaser shall be entitled to receive the maximum amount of all the fees and expenses due pursuant to this Agreement to the extent the receipt of those fees and expenses would not subject the Purchaser to either civil or criminal liability.  The Parties agree that the law of the Chosen State shall apply to this transaction

REV. 1/06

Phoenix Medical Group, LLC dba Phoenix Medical Staffing

notwithstanding the location of Seller's principal place of business.

5. **Repurchase of Accounts.**

    **5.1.   At Purchaser's Requirement.** Purchaser may require that Seller repurchase, by payment of the then unpaid Face Amount thereof, together with any unpaid fees relating to the Purchased Account, on demand, any Purchased Account (a) the payment of which has been disputed by the Account Debtor obligated thereon, (b) for which Seller has breached its warranty as set forth in Section 11 hereof, (c) upon an Event of Default; (d) that is not paid on or before the date that is 90 days after the date of the Invoice, or (e) that Purchaser for any reason, in good faith, deems itself insecure with respect to the prospect of repayment of the Purchased Account.  In addition, Seller acknowledges that Purchaser is under no obligation to determine if any dispute between Seller and Account Debtor is bona fide.

    **5.2.   At Seller's Request.** Seller may repurchase any Purchased Account that has not Closed within ninety (90) days of the Purchase Date by paying to Purchaser the then unpaid Face Amount thereof, together with any unpaid fees relating to the Purchased Account.

    **5.3.   No Warranty on Repurchase.** THE REPURCHASE BY SELLER OF ANY PURCHASED ACCOUNT WILL BE MADE "AS IS" AND WITHOUT ANY WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

6. **Security Interest.** The Parties intend that the transactions evidenced by this Agreement and the related documents are sales of Accounts from Seller to Purchaser and not loans from Purchaser to Seller secured by the Collateral, including the Purchased Accounts.  However, in order to preserve Purchaser's rights under this Agreement in the event that a court or other forum recharacterizes the transaction contemplated under this Agreement as other than a sale of the Purchased Account, and to secure the Obligations (including Seller's performance under this Agreement), Seller hereby grants to Purchaser a continuing first priority security interest in and to the Collateral.  Seller shall execute and deliver to Purchaser such documents and instruments as Purchaser may request from time to time in order to evidence and perfect its security interest in the Collateral.

7. **Authorizations of Seller; Limits on Liability; Indemnification.**

    **7.1.   Authorization.** Seller hereby irrevocably authorizes Purchaser, at Seller's expense, to exercise at any time any of the following powers until all of the Obligations have been paid in full: (a) receive, take, endorse, assign, deliver, accept and deposit, in the name of Purchaser or Seller, any and all cash, checks, commercial paper, drafts, remittances and other instruments and documents relating to the Collateral or the proceeds thereof; (b) take or bring, in the name of Purchaser or Seller, all steps, actions, suits or proceedings deemed by Purchaser necessary or desirable to effect collection of or otherwise realization upon the Accounts and other Collateral; (c) after an Event of Default, change the address for delivery of mail to Seller and to receive and open mail addressed to Seller; (d) after an Event of Default, extend the time of payment of, compromise or settle for cash, credit,

return of merchandise, and upon any terms or conditions, any and all Accounts or other Collateral which includes a monetary obligation and discharge or release any Account Debtor or other obligor (including filing of any public record releasing any lien granted to Seller by such Account Debtor), without affecting any of the Obligations; (e) pay any sums necessary to discharge any lien or encumbrance which is senior to Purchaser's security interest in the Collateral, which sums shall be included as Obligations hereunder; (f) file in the name of Seller or Purchaser or both, (i) mechanic's lien or related notices or (ii) claims under any payment bond, in connection with goods or services sold by Seller in connection with the improvement of realty; and (g) notify any Account Debtor obligated with respect to any Account, that the underlying Account has been assigned to Purchaser by Seller and that payment thereof is to be made to the order of and directly and solely to Purchaser; and (i) communicate directly with Seller's Account Debtors to verify the amount and validity of any Account created by Seller.

    **7.2.   Authorization to File Financing Statements.** Seller authorizes Purchaser at any time and from time to time to file any initial financing statements and amendments thereto that: (a) indicate the Collateral as all assets of Seller or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC, or as being of an equal or lesser scope or with greater detail; (b) contain any other information required by the UCC for the sufficiency or filing office acceptance of any financing statement or amendment; (c) contain a notification that Seller has granted a negative pledge to the Purchaser, and that any subsequent lienor may be tortiously interfering with Purchaser's rights; or (d) advise third parties that any notification of Seller's Account Debtors will interfere with Purchaser's collection rights.

    **7.3.   Limits on Liability.** Seller hereby releases and exculpates Purchaser, its officers, employees and designees, from any liability arising from any acts under this Agreement or in furtherance thereof whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for willful misconduct. Without limiting the generality of the foregoing, Seller releases Purchaser from any claims which Seller may now or hereafter have arising out of Purchaser's endorsement and deposit of checks issued by Seller's customers stating that they were in full payment of an account, but issued for less than the full amount which may have been owed on the account. IN NO EVENT WILL PURCHASER HAVE ANY LIABILITY TO SELLER FOR LOST PROFITS OR OTHER SPECIAL OR CONSEQUENTIAL DAMAGES.

    **7.4.   Claims with Account Debtor.** Seller authorizes Purchaser to accept, endorse and deposit on behalf of Seller any checks tendered by an Account Debtor "in full payment" of its obligation to Seller.  Seller shall not assert against Purchaser any claim arising therefrom, irrespective of whether such action by Purchaser effects an accord and satisfaction of Seller's claims, under Section 3-311 of the UCC, or otherwise.

    **7.5.   Indemnification.** Seller agrees to indemnify and hold harmless Purchaser, its officers, employees and designees from and against any claims, damages, losses, liabilities and expenses (including, without limitation, reasonable attorneys' fees and costs of collection) that may be incurred by or asserted or awarded against

Phoenix Medical Group, LLC dba Phoenix Medical Staffing

REV. 1/06

Purchaser, its officers, employees or designees relating to or arising out the performance or non-performance of its obligations under this Agreement and any claims raised by any Account Debtor or any other third party.

**8.    ACH Authorization.** In order to satisfy any of the Obligations, Purchaser is hereby authorized by Seller to initiate electronic debit or credit entries through the ACH system to Seller's Account or any other deposit account maintained by Seller wherever located.

**9.    Covenants By Seller.**

**9.1.  Preserve Collateral.** After written notice by Purchaser to Seller, and automatically, without notice, after an Event of Default, Seller shall not, without the prior written consent of Purchaser in each instance, (a) grant any extension of time for payment of any of the Accounts or any other Collateral which includes a monetary obligation, (b) compromise or settle any of the Accounts or any such other Collateral for less than the full amount thereof, (c) release in whole or in part any Account Debtor or other person liable for the payment of any of the Accounts or any such other Collateral, or (d) grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any of the Accounts or any such other Collateral.

**9.2.  Access and Disclosure.** From time to time as requested by Purchaser, at the sole expense of Seller, Purchaser or its designee shall have access, during reasonable business hours if prior to an Event of Default and at any time if on or after an Event of Default, to all premises where Collateral is located for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, including Seller's books and records, and Seller shall permit Purchaser or its designee to make copies of such books and records or extracts therefrom as Purchaser may request. Without expense to Purchaser, Purchaser may use any of Seller's personnel, equipment, including computer equipment, programs, printed output and computer readable media, supplies and premises for the collection of Accounts and realization on other Collateral as Purchaser, in its sole discretion, deems appropriate. Seller hereby irrevocably authorizes all accountants and third parties to disclose and deliver to Purchaser at Seller's expense all financial information, books and records, work papers, management reports and other information in their possession relating to Seller.

**9.3.  Invoice Stamp.** Before sending any Invoice to an Account Debtor, Seller shall mark same with a notice of assignment as may be required by Purchaser.

**9.4.  Taxes.** Seller shall pay when due all payroll and other taxes, and shall provide proof thereof to Purchaser in such form as Purchaser shall reasonably require.

**9.5.  Liens or Sales.** Seller shall not create, incur, assume or permit to exist any lien upon or with respect to any Collateral now owned or hereafter acquired by Seller, nor shall Seller sell or otherwise dispose of any of the Collateral other than sales of Purchased Accounts to Purchaser as contemplated by this Agreement.

**9.6.  Insurance.** Seller shall maintain insurance on all insurable property owned or leased by Seller in the manner, to the extent and against at least such risks (in any event, including but not limited to fire and business

interruption insurance) as usually maintained by owners of similar businesses and properties in similar geographic areas. All such insurance shall be in amounts and form and with insurance companies acceptable to Purchaser in its sole discretion. Seller shall furnish to Purchaser: (a) upon written request, any and all information concerning such insurance carried; and (b) as requested by Purchaser, lender loss payable endorsements (or their equivalent) in favor of Purchaser. All policies of insurance shall provide for not less than thirty (30) days' prior written cancellation notice to Purchaser.

**9.7.  Misdirected Payments.** Notwithstanding that Seller has agreed to pay the Misdirected Payment Fee, Seller shall deliver in kind to Purchaser on the next banking day following the date of receipt by Seller of the amount of any payment on account of a Purchased Account.

**9.8.  Avoidance Claims.** Seller shall indemnify Purchaser from any loss arising out of the assertion of any Avoidance Claim (other than an Avoidance Claim which relates to Purchased Accounts that are the subject of an Insolvency Event which occurs prior to the Outside Date in respect of such Purchased Account), and shall pay to Purchaser on demand the amount thereof. Seller shall notify Purchaser within two (2) business days of it becoming aware of the assertion of an Avoidance Claim. This provision shall survive termination of this Agreement.

**9.9.  Changes; Merger; Consolidation.** Seller will not, without the written consent of Purchaser, merge into or consolidate with any other entity. Seller will not change its name, state of incorporation or organization, or type of organization, without providing thirty (30) days prior written notice to Purchaser and all information requested by Purchaser with respect to such change.

**10.   Account Disputes.** Seller shall notify Purchaser promptly of, and, if requested by Purchaser, will settle all disputes concerning any Purchased Account at Seller's sole cost and expense. However, Seller shall not, without Purchaser's prior written consent, compromise or adjust any Purchased Account or grant any additional discounts, allowances or credits thereon. Purchaser may, but is not required to, attempt to settle, compromise, or litigate (collectively, "Resolve") the dispute upon such terms as Purchaser in its sole discretion deems advisable, for Seller's account and risk and at Seller's sole expense. Upon the occurrence of an Event of Default, Purchaser may resolve such issues with respect to any Account of Seller.

**11.   Representation and Warranty.** Seller represents and warrants to Purchaser (which representations and warranties are true on the date hereof and will remain true on and as of the date of each sale of a Purchased Account hereunder) that: (a) it is fully authorized to enter into this Agreement and to perform the obligations hereunder; (b) this Agreement constitutes its legal, valid and binding obligation; (c) it is solvent and in good standing in the state of its organization; (d) the Purchased Accounts are and will remain (i) bona fide existing obligations of the Account Debtor created by the sale and delivery of goods or the rendition of services in the ordinary course of Seller's business and (ii) unconditionally owed and, subject to an Insolvency Event, payable to Purchaser without defenses, disputes, offsets, counterclaims, or rights of return or cancellation; (e) Purchaser has not received notice of actual or imminent bankruptcy, insolvency, or material impairment of the financial condition of any applicable Account Debtor regarding Purchased Accounts; and (f) all of the information in the application and other documents completed by Seller and provided to Purchaser, including the Seller's legal name,

Page 4 of 7

REV. 1/06

Phoenix Medical Group, LLC dba Phoenix Medical Staffing

Seller's state of incorporation or organization, and the type of organization of Seller, is true, correct and complete.

12. **Default.**

    12.1. Events of Default. The following events will constitute an Event of Default hereunder: (a) Seller defaults in the payment of any Obligations or in the performance of any provision hereof or of any other agreement now or hereafter entered into with Purchaser; or any warranty or representation contained herein proves to be false in any way, howsoever minor, (b) Seller or any guarantor of the Obligations becomes subject to any debtor-relief proceedings; (c) any such guarantor fails to perform or observe any of such guarantor's obligations to Purchaser or shall notify Purchaser of its intention to rescind, modify, terminate or revoke any guaranty of the Obligations, or any such guaranty shall cease to be in full force and effect for any reason whatever; or (d) Purchaser for any reason, in good faith, deems itself insecure with respect to the prospect of repayment or performance of the Obligations.

    12.2. WAIVER OF NOTICE. SELLER WAIVES ANY REQUIREMENT THAT PURCHASER INFORM SELLER BY AFFIRMATIVE ACT OR OTHERWISE OF ANY ACCELERATION OF SELLER'S OBLIGATIONS HEREUNDER. FURTHER, PURCHASER'S FAILURE TO CHARGE OR ACCRUE INTEREST OR FEES AT ANY "DEFAULT" OR "PAST DUE" RATE SHALL NOT BE DEEMED A WAIVER BY PURCHASER OF ITS CLAIM THERETO.

    12.3. Effect of Default. Upon the occurrence of any Event of Default, in addition to any rights Purchaser has under this Agreement or applicable law, Purchaser may immediately terminate this Agreement, at which time all Obligations shall immediately become due and payable without notice.

13. **Account Stated.** Purchaser shall render to Seller a statement setting forth the transactions arising hereunder. Each statement shall be considered correct and binding upon Seller as an account stated, except to the extent that Purchaser receives, within sixty (60) days after the mailing of such statement, written notice from Seller of any specific exceptions by Seller to that statement, and then it shall be binding against Seller as to any items to which it has not objected.

14. **Waiver.** No failure to exercise and no delay in exercising any right, power, or remedy hereunder shall impair any right, power, or remedy which Purchaser may have, nor shall any such delay be construed to be a waiver of any of such rights, powers, or remedies, or any acquiescence in any breach or default hereunder; nor shall any waiver by Purchaser of any breach or default by Seller hereunder be deemed a waiver of any default or breach subsequently occurring. All rights and remedies granted to Purchaser hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of action begun to enforce, any such right or remedy. The rights and remedies specified herein are cumulative and not exclusive of each other or of any rights or remedies that Purchaser would otherwise have. Any waiver, permit, consent or approval by Purchaser of any breach or default hereunder must be in writing and shall be effective only to the extent set forth in such writing and only as to that specific instance.

15. **Termination; Effective Date.** This Agreement will be effective when accepted by Purchaser and shall be further annually extended automatically. Notwithstanding the foregoing, Seller may terminate this Agreement by giving Purchaser thirty (30) days' prior written notice of termination, whereupon this Agreement shall terminate on the earlier date of the date of termination or on the anniversary date of this Agreement. Upon termination, Seller shall pay the Obligations to Purchaser, and Purchaser shall not purchase any Accounts from Seller.

16. **Amendment.** Neither this Agreement nor any provisions hereof may be changed, waived, discharged or terminated, nor may any consent to the departure from the terms hereof be given, orally (even if supported by new consideration), but only by an instrument in writing signed by all parties to this Agreement. Any waiver or consent so given shall be effective only in the specific instance and for the specific purpose for which given.

17. **No Lien Termination Without Release.** In recognition of the Purchaser's right to have its attorneys' fees and other expenses incurred in connection with this Agreement secured by the Collateral, notwithstanding payment in full of all Obligations by Seller, Purchaser shall not be required to record any terminations or satisfactions of any of Purchaser's liens on the Collateral unless and until Seller has executed and delivered to Purchaser a general release in a form reasonably satisfactory to Purchaser. SELLER UNDERSTANDS THAT THIS PROVISION CONSTITUTES A WAIVER OF ITS RIGHTS UNDER SECTION 9-513 OF THE UCC.

18. **Conflict.** Unless otherwise expressly stated in any other agreement between Purchaser and Seller, if a conflict exists between the provisions of this Agreement and the provisions of such other agreement, the provisions of this Agreement shall control.

19. **Survival.** All representations, warranties and agreements herein contained shall be effective so long as any portion of this Agreement remains executory.

20. **Severability.** In the event any one or more of the provisions contained in this Agreement is held to be invalid, illegal or unenforceable in any respect, then such provision shall be ineffective only to the extent of such prohibition or invalidity, and the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

21. **Enforcement.** This Agreement and all agreements relating to the subject matter hereof is the product of negotiation and preparation by and among each party and its respective attorneys and shall be construed accordingly.

22. **Relationship of Parties.** The relationship of the parties hereto shall be that of Seller and Purchaser of Accounts, and neither party is or shall be deemed a fiduciary of or to the other.

23. **Attorneys Fees.** Seller agrees to reimburse Purchaser on demand for (a) the actual amount of all costs and expenses, including attorneys' fees, which Purchaser has incurred or may incur in (i) negotiating, preparing, or administering this Agreement and any documents prepared in connection herewith, all of which shall be paid contemporaneously with the execution hereof, (ii) any way arising out of this Agreement and (iii) protecting, preserving or enforcing any lien, security interest or other right granted by Seller to Purchaser or arising under applicable law, whether or not suit is brought, including but not limited to the defense of any Avoidance Claims or the defense of Purchaser's lien priority; (b)

REV. 1/06

Phoenix Medical Group, LLC dba Phoenix Medical Staffing

the actual costs, including photocopying (which, if performed by Purchaser's employees, shall be at the rate of $.10/page), travel, and attorneys' fees and expenses incurred in complying with any subpoena or other legal process attendant to any litigation in which Seller is a party; (e) either (the choice of which shall be in the sole discretion of Purchaser) (i) the actual amount of all costs and expenses, including attorneys' fees, which Purchaser may incur in enforcing this Agreement and any documents prepared in connection herewith, or in connection with any federal or state insolvency proceeding commenced by or against Seller, including those (A) arising out the automatic stay, (B) seeking dismissal or conversion of the bankruptcy proceeding, or (C) opposing confirmation of Seller's plan thereunder, or (ii) twenty percent (20%) of the amount of the claim of Purchaser against Seller, which Seller agrees shall constitute a reasonable substitute for such actual fees and expenses. Any such costs and expenses incurred after the execution hereof shall become part of the Obligations when incurred and may be added to the outstanding principal amount due hereunder.

24.  **Entire Agreement.** This Agreement supersedes all other agreements and understandings between the parties hereto, verbal or written, express or implied, relating to the subject matter hereof. No promises of any kind have been made by Purchaser or any third party to induce Seller to execute this Agreement. No course of dealing, course of performance or trade usage, and no parole evidence of any nature, shall be used to supplement or modify any terms of this Agreement.

25.  **Choice of Law.** This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the Chosen State.

26.  **Assignment.** Purchaser may assign its rights and delegate its duties hereunder. Upon such assignment, Seller shall be deemed to have attorned to such assignee and shall owe the same obligation to such assignee and shall accept performance hereunder by such assignee as if such assignee were Purchaser. Upon any such assignment, Purchaser shall be relieved of any liability thereafter accruing under this Agreement.

27.  **JURY TRIAL WAIVER.** IN RECOGNITION OF THE HIGHER COSTS AND DELAY WHICH MAY RESULT FROM A JURY TRIAL, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING HEREUNDER, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

28.  **Venue; Jurisdiction.** The parties agree that any suit, action or proceeding arising out of the subject matter hereof, or the interpretation, performance or breach of this Agreement, shall, if Purchaser so elects, be instituted in the United States District Court for the District in which Purchaser's chief executive office is then located or any court of the Chosen State located within fifty (50) miles of Purchaser's chief executive office (the "Acceptable Forums"). Each party agrees that the Acceptable Forums are convenient to it, and each party irrevocably submits to the jurisdiction of the Acceptable Forums, irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement, and waives any and all objections to jurisdiction or venue that it may have under the laws of the Chosen State or otherwise in those courts in any such suit, action or proceeding. Should such proceeding be initiated in any other forum, Seller waives any right to oppose any motion or application made by Purchaser as a consequence of such proceeding having been commenced in a forum other than an Acceptable Forum.

29.  **Notice.** All notices required to be given to any party other than Purchaser shall be deemed given upon the first to occur of (a) deposit thereof in a receptacle under the control of the United States Postal Service, (b) transmittal by electronic means to a receiver under the control of such party, or (c) actual receipt by such party or an employee or agent of such party.  All notices to Purchaser hereunder shall be deemed given upon actual receipt by a responsible officer of Purchaser. For the purposes hereof, notices hereunder shall be sent to the following addresses, or to such other addresses as each such party may in writing hereafter indicate:

**SELLER**

Address:      16211 N. Scottsdale Rd A6A
              Ste 42
              Scottsdale AZ 85254

Officer;
Fax Number:   Tom Harmon

**PURCHASER**

Address:      PRN Funding, LLC
              25101 Chagrin Blvd. Suite 250
              Cleveland, OH 44122

Officer:      Philip M. Cohen
Fax Number:   (216) 504-1002

30.  **Counterparts.** This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by facsimile or by electronic signature shall be effective as delivery of a manually executed counterpart of this Agreement, and any party delivering such an executed counterpart of the signature page to this Agreement by facsimile or by electronic signature to any other party shall thereafter also promptly deliver a manually executed counterpart of this Agreement to such other party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this Agreement.

REV. 1/06

Phoenix Medical Group, LLC dba Phoenix Medical Staffing

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

SELLER:                                    Phoenix Medical Group, LLC dba Phoenix Medical Staffing

                                           By: _____

                                           Name: _Tom Harmon_____

                                           Title: _Manager_____


PURCHASER:                                 PRN FUNDING, LLC

                                           By: _____

                                           Name: Philip M. Cohen

                                           Title: President

Page 7 of 7

**PRN** FUNDING, LLC

25101 Chagrin Boulevard        216.504.1000
Suite 250                      866.776.5407
CLEVELAND, OHIO 44122          216.504.1002 fax



April 11, 2023

Vista Medical Center
1324 North Sheridan Rd
Waukegan, IL 60085

    **Re: Phoenix Medical Group LLC dba Phoenix Medical Staffing**

Attn: Accounts payable:

In order to accommodate the growth of their business, Phoenix Medical Group LLC has retained
the services of PRN Funding, LLC to fund and manage their accounts receivable. This
arrangement includes the assignment of payments on Phoenix Medical Group LLC accounts to
PRN Funding, LLC under the Uniform Commercial Code laws. This small change in procedure
will allow Phoenix Medical Group LLC to serve you more efficiently.

To the extent that you are now indebted or may in the future become indebted to Phoenix
Medical Group LLC an account or a general intangible, payment thereof is to be made payable to
us and not to Phoenix Medical Group LLC or any other entity. Payment in any other way will
not discharge this obligation.

   The payments should be mailed to us at the following address:

     PRN Funding, LLC
     P.O. Box 637924
     Cincinnati, OH 45263-7924

   If payment is to be sent electronically, please see attached ACH instructions.

Your incurrence of additional indebtedness to Phoenix Medical Group LLC after the date hereof
shall be deemed an acceptance of the terms of this letter. This letter may only be revoked by a
writing signed by one of our officers and acknowledged before a notary public.

Very truly yours,

Wade Heerboth
Account Manager

**EXHIBIT**

2



181900872



# IN THE COURT OF COMMON PLEAS
# CUYAHOGA COUNTY, OHIO

PRN FUNDING, LLC
    Plaintiff

Case No: CV-24-996335

Judge: JEFFREY P SAFFOLD

WAUKEGAN ILLINOIS HOSPITAL COMPANY, LLC
    Defendant

## **JOURNAL ENTRY**

MOTION FILED FOR D1 WAUKEGAN ILLINOIS HOSPITAL COMPANY, LLC DBA VISTA MEDICAL CENTER EAST
MARK M. TURNER 0075516 MOTION FOR 30 DAYS LEAVE TO ANSWER OR OTHERWISE PLEAD, FILED 05/16/2024, IS
GRANTED.

_____
Judge Signature         05/20/2024

05/20/2024

RECEIVED FOR FILING
05/20/2024 17:10:11
NAILAH K. BYRD, CLERK

Page 1 of 1



Exhibit C

*coconnell@smdklaw.com*

March 21, 2024

**VIA FEDERAL EXPRESS**
Vista Medical Center
1324 North Sheridan Road
Waukegan, IL 60085

      Re:     <u>PRN Funding, LLC / Phoenix Medical Group LLC</u>

To whom it may concern:

      The undersigned and this office represent PRN Funding, LLC ("PRN"). PRN is the owner and assignee of certain accounts receivable owed to Phoenix Medical Group LLC dba Phoenix Medical staffing ("Phoenix Medical") for services provided to Vista Medical Center ("Vista Medical"). PRN provided notice of this assignment via the attached notice of assignment first sent on or about April 11, 2023. Upon receipt of the notice, Waukegan Hospital Corporation ("Waukegon Hospital"), on behalf of Vista Medical, began making payments to PRN. However, for reasons unknown, Waukegon Hospital and/or Vista Medical ceased making payments. To date, there are unpaid invoices totaling $313,222.50.

      **The law, including section 9-406 of the UCC, specifically states that Vista Medical (i.e. the account debtor) must make payment directly to PRN. If Vista Medical fails to pay PRN, or pays someone other than PRN, then it remains liable to PRN for the full amount. By paying anyone other than PRN, Vista Medical is exposing itself to double liability in the event misdirected payments are not remitted to PRN. To date, Vista Medical has failed to pay PRN $313,222.50 for services provided by Phoenix Medical, which receivables were purchased by, and are owed to, PRN. These invoices are long overdue.** Vista Medical is required by law to pay these funds to PRN.

      If I do not hear from you within ten (10) days from the date of this letter, PRN has instructed my firm to use any and all legal and equitable means at our disposal to recover this amount, including but not limited to filing a lawsuit for all damages suffered.

                         Respectfully,

                         Christopher O'Connell

cc:     PRN Funding, LLC
         Waukegan Hospital Corporation (faisal.gill@amhealthsystems.com;
         Carlos.Alcazar@amhealthsystems.com; bdefilippi@amhealthsystems.com)

**PRN** FUNDING, LLC

25101 Chagrin Boulevard    216.504.1000
Suite 250                  866.776.5407
CLEVELAND, OHIO 44122      216.504.1002 fax



April 11, 2023

Vista Medical Center
1324 North Sheridan Rd
Waukegan, IL 60085

**Re:  Phoenix Medical Group LLC dba Phoenix Medical Staffing**

Attn:  Accounts payable:

In order to accommodate the growth of their business, Phoenix Medical Group LLC has retained
the services of PRN Funding, LLC to fund and manage their accounts receivable. This
arrangement includes the assignment of payments on Phoenix Medical Group LLC accounts to
PRN Funding, LLC under the Uniform Commercial Code laws. This small change in procedure
will allow Phoenix Medical Group LLC to serve you more efficiently.

To the extent that you are now indebted or may in the future become indebted to Phoenix
Medical Group LLC an account or a general intangible, payment thereof is to be made payable to
us and not to Phoenix Medical Group LLC or any other entity.  Payment in any other way will
not discharge this obligation.

The payments should be mailed to us at the following address:

PRN Funding, LLC
P.O. Box 637924
Cincinnati, OH 45263-7924

If payment is to be sent electronically, please see attached ACH instructions.

Your incurrence of additional indebtedness to Phoenix Medical Group LLC after the date hereof
shall be deemed an acceptance of the terms of this letter. This letter may only be revoked by a
writing signed by one of our officers and acknowledged before a notary public.

Very truly yours,

Wade Heerboth
Account Manager

**www.prnfunding.com**

Certificate of Service

I hereby certify that a true and correct copy of the forgoing Notice of Removal to Federal Court

has been served by undersigned counsel on this date to all parties.

Dated: June 26, 2024

Respectfully submitted,

Mark M. Turner, Esq. (#0075516)
Law Offices of Mark M. Turner
3091 Mayfield Rd. Suite 320B
Cleveland Heights, Ohio 44118
(216)-331-0007 P
mmturneresq@gmail.com
*Attorney for Defendant*